462 So.2d 689 (1984)
Emma HUDSON
v.
Alfio RAUSA and Mavis Green.
No. 55101.
Supreme Court of Mississippi.
November 21, 1984.
Rehearing Denied February 13, 1985.
*690 William Liston, Alan D. Lancaster, Liston, Gibson & Lancaster, Winona, for appellant.
David E. Flautt, Tommie Williams, Upshaw & Ladner, Greenwood, Bill Patterson, McCoy, Wilkins, Noblin, Anderson & Stephens, Oscar P. Mackey, Guy N. Rogers, Jackson, for appellees.
Before WALKER, P.J., HAWKINS and ROBERTSON, JJ., and SUGG, Retired Supreme Court Justice.
SUGG, Retired Supreme Court Justice, for the Court:[1]
The questions in this case are whether, and to what extent, employees of the State Department of Health enjoy immunity to a civil action for damages arising out of the performance of their official duties. The answer to these questions ultimately turns on whether the acts complained of were discretionary acts as opposed to ministerial acts. The trial court held that at the time in question these defendants were acting in their discretionary capacity and, accordingly, enjoyed immunity in the face of this suit. We agree and affirm.
This action was instituted by Emma Hudson, widow of Earl Hudson, under the provisions of our Wrongful Death Statute (Section 11-7-13, Mississippi Code Annotated, 1972), on behalf of herself and the four children of Earl Hudson. In the amended complaint the State of Mississippi and two others were named as defendants along with Alfio Rausa and Mavis Green. All defendants except Rausa and Green were dismissed by the plaintiff. Hudson alleged her husband's death on February 23, 1981, was caused by the negligence of Rausa and Green as follows:
(a) in prescribing INH to the decedent when they knew or should have known that due to his age and other relevant factors that his taking of said drug was contra-indicated in that it created an unreasonable risk of death;
(b) in failing to properly inform the decedent of the possible consequences of his taking INH when they knew or should have known of said consequences, thereby depriving him of the opportunity to make a reasoned and voluntary decision as to whether to subject himself to the proposed course of treatment;
(c) in failing to properly diagnose the decedent's medical condition;
(d) in failing to perform tests to determine the cause of the decedent's symptoms;
(e) in failing to administer a proper course of medical treatment of the decedent's condition; and
(f) in failing to recommend that the decedent cease taking INH when they knew or should have known that his continuing *691 to take said drug could foreseeable [sic] result in his death.
In paragraphs IV and V of her complaint, Hudson alleged:
At all times hereinafter mentioned, the defendant, Alfio Rausa, was a duly licensed physician under the laws of the State of Mississippi and was acting in his individual capacity and within the scope of his employment with the Mississippi State Board of Health, an agency of the State of Mississippi, as the District Health Officer for District III of said Board and the local county health officer for the Montgomery County Health Department, Montgomery County, Mississippi, a subdivision of said Board.
At all times hereinafter mentioned, the defendants, Mavis Green, Belinda Chambley and Gail Rogers, were employees of the Montgomery County Health Department, a subdivision of the Mississippi State Board of Health, and were acting in their individual capacities and within the scope of their employment as health nurses with said Health Department and were under the direction, supervision and control of the defendants, Alfio Rausa and the State of Mississippi.
Rausa and Green filed separate answers and in each answer the defendants as a first defense pled the complaint failed to state a claim upon which relief could be granted. Their second defense was that they were immune from suit. Both defendants fully answered the complaint and concluded with affirmative defenses.
In answer to paragraph IV of the complaint, Dr. Rausa admitted that he was a duly licensed physician acting within the scope of his employment with the Mississippi State Board of Health as District Health Officer for District III but denied he was acting in his individual capacity.
In her answer, Green admitted only that she was an employee of Montgomery County Health Department, a subdivision of the Mississippi State Board of Health, and that she was acting within the course and scope of her employment with the Health Department under the direction, supervision, and control of Dr. Rausa and the State of Mississippi. With reference to the other allegations of paragraph V, Green stated she was without sufficient information to form a belief as to the truth or correctness of the allegations. All of the parties, both complainants and defendants, filed requests for admissions and interrogatories which were answered by the respective parties.
Dr. Rausa and Green filed separate motions to dismiss under Rule 12(b)(6), asserting the complaint failed to state a cause of action upon which relief could be granted by reason of immunity.
When the motions came on for hearing, the trial judge considered matters outside the pleadings,[2] and granted summary judgment for defendants dismissing the complaint with prejudice at the cost of plaintiff. In his order of dismissal the judge found without contradiction several important matters:
1. That Defendants Alfio Rausa and Mavis Green are, as employees of the Mississippi State Department of Health, public officials who are each vested with discretionary authority.
2. That Plaintiff does not contend that either of the said Defendants, at any relevant time, were acting outside the scope of their respective employments to the Mississippi State Department of Health.
3. That each and every allegation contained in the Amended Complaint regarding the alleged negligent acts of the various Defendants necessarily involves the actions of those Defendants in their discretionary capacities.

*692 4. That, therefore, Defendants Alfio Rausa and Mavis Green, as public officials, acting within the scope of their employment, and further as public officials acting within the scope of the discretionary authority with which they are vested, are immune from suit in these premises.
No counter affidavits were filed by plaintiff as authorized under Rule 56. There was no genuine issue of material fact, and defendants were entitled to judgment as a matter of law.
Earl Hudson was the named contact of an individual, Marshall Forrest, who had been diagnosed as having infectious tuberculosis. Forrest and Hudson both worked at the Kimco Plant, a factory which according to Dr. Rausa "suggested the possible inhalation of asbestos and silica fibers, both of which would be likely to impair or reduce an individual's lung capacity." Dr. Rausa further stated in answer to interrogatory 7 that Earl Hudson was a high risk contact of Marshall Forrest because of the factors set forth above and because of the fact that the employees at Kimco shared a common eating area and a high number of employees had positive Mantoux test results. The high number of employees showing positive test results, without the apparent distinction between the races, indicated a strong possibility that tuberculosis was being transmitted within the plant.
In answer to interrogatory 8, Dr. Rausa stated:
Because of evidence that there was transmission of tuberculosis within the factory where Mr. Hudson worked, the risks associated with the type of work and factory area, and the absence of contraindications in Mr. Hudson's previous medical history, it was appropriate that he be offered INH. During the time Mr. Hudson was under the management of the Montgomery County Health Department, he developed no symptoms that would have justified discontinuing this medication. His medical records show that his urine was amber but not abnormal in appearance, both at his last visit to the health department and at his subsequent visit to Dr. Middleton.
Accordingly on October 24, 1980, the medication INH was prescribed for Earl Hudson by Dr. Rausa which was dispensed on October 31, 1980, by a pharmacist at the Mississippi State Department of Health. On December 1, 1980, and January 2, 1981, additional INH was dispensed to Earl Hudson. In answer to a request for admissions, Rausa admitted that severe and some times fatal hepatitis is associated with INH therapy; that the risk of developing INH induced hepatitis is age related; that approximately 2.3% of persons in the 50 to 64 age category taking INH therapy developed progressive liver damage; that renal damage is not a toxic effect of INH therapy; that low urine output is not one of the signs that INH is having a toxic effect on the individual taking the medication; and that his discontinuing INH is not indicated for all symptoms or side effects. Earl Hudson died February 23, 1981, and the death certificate shows the immediate cause of death was a massive hemorrhage as a consequence of hepatic failure. Another significant condition listed was renal failure. In answer to request for admissions, Emma Hudson stated that Earl Hudson was tested on October 10, 1980 at the Kimco Plant and his PPD skin test showed a positive reaction.
The Mississippi State Board of Health issued in July 1974, a publication entitled Policies, Treatment and Supervision in the Tuberculosis Control Program. It is stated in this publication that the ultimate goal of tuberculosis programs is the elimination of tuberculosis as a public health problem and that the control of tuberculosis depends primarily on locating the tuberculous, their families, their associates, and those infected with tubercle bacilli. General guides and concepts are then given which influence public health nursing and tuberculosis control. Dr. Rausa was the local health officer of Montgomery County and as such was charged with certain duties with respect to communicable diseases including but not limited to tuberculosis. His duties are covered in part by *693 rules and regulations governing reportable diseases issued January 1, 1978, by the Mississippi State Board of Health. These rules provide:
The director of the local health department, as the local health officer, shall be responsible for the control of communicable diseases and other conditions within his jurisdiction considered prejudicial to the public health. It shall be his duty to collect and make reports as required to the Mississippi State Board of Health, to provide consultation service to physicians in communicable diseases, to advise and consult with all others in matters relating to public health and to investigate reports of known or suspected communicable diseases or of conditions which might be prejudicial to the public health. It shall be his duty to determine in individual cases or groups of cases whether to impose restrictions on the activities of patients or contacts of communicable disease and to fix the period of isolation or quarantine for such diseases. In all matters where there is disagreement as to diagnosis, isolation, quarantine or in any other situation where the responsibility rests with the health officer, the opinion of the health officer shall prevail. In the discharge of his duties, the health officer shall not be denied the right of entry to any premises. (Emphasis added.)
The defendant Mavis Green was a registered nurse licensed by the State of Mississippi and employed as the Supervisor of Nurses of the Montgomery County Health Department. The duties of public health nurses are set forth in the State Board of Health July 1974, publication of Policies, Treatment and Supervision in the Tuberculosis Control Program as follows:
The family health service given by public health nurses in the generalized public health program helps the family achieve and maintain physical and mental well being and teaches them measures to prevent illness. The generalized nursing service encompasses a wide variety of conditions as well as guidance in problems relating to health for all age groups. This comprehensive service is carried out in cooperation with health, education and social welfare agencies that supply financial assistance and vocational rehabilitation.
Public Health Nursing in the tuberculosis program requires the utilization of the nurses' skills, knowledge and comprehension of the principles of the control of tuberculosis. Family health services to those persons or families with tuberculosis requires more than the knowledge of the disease which is basic in order to give care. Tuberculosis nursing demands an interest in every aspect of family and community health and sound judgment making sure that their needs receive appropriate emphasis. The nurse's understanding the fears, superstitions, and cultural patterns of the family should help the nurse give supportive health supervisions and to assess the need for services beyond those she can give.
Public Health Nursing service provided by our county and state health departments includes instruction and demonstration in care, isolation precautions, preventive measures and direct services such as chemotherapy, x-ray, and laboratory services, in clinics and homes. The objective is to help the family to be more resourceful in meeting their own needs, planning with the family for the best possible care considering the available facilities and the ability of the family and the community to provide care... .
We turn now to the law of this State pertinent to the question in this case of whether the acts of the defendants Rausa and Green were discretionary acts or ministerial acts. In Pruett v. City of Rosedale, 421 So.2d 1046, 1051, 1052 (Miss. 1982), this Court abolished sovereign immunity,[3] but retained qualified immunity for officials *694 performing discretionary public functions in the following language:
We need first to consider the extent to which the decision here applies to those actions by a state agency, an arm of the state or local government and the members thereof, who either for remuneration or as public service, engage in discretionary functions for which the agency or the arm of government was set up. We surely can see that this would be the first question raised by the bench, bar and all laymen. Although absolute governmental immunity from tort liability has lost favor with the courts, there is still considerable support for shielding certain governmental activities from liability. Judicial review of basic policy-making decisions continues to be regarded by many as inappropriate because courts have no standards by which to judge such decisions. Judges and jurors are in no better position to evaluate the reasonableness of policy determinations than are those officials who are charged with making them. The reasonable man standard of tort law is not an appropriate measure for the political, social or economic desirability of government programs and the methods selected for pursuing them. State tort standards cannot adequately control those government decisions in which, to be effective, the decision maker must look to considerations of public policy and not merely to established professional standards or to standards of general reasonableness.

The imposition of liability on governments for the exercise of legislative, judicial and executive acts may result in overcautiousness on the part of the officials who carry out such responsibilities.
With the foregoing problems of everyday governmental functions by individuals, it is our opinion that abolishment of sovereign immunity does not apply to legislative, judicial and executive acts by individuals acting in their official capacity, or to similar situations of individuals acting in similar capacities in local governments, either county or municipal. (Emphasis added.)
In determining whether an act of a public official is discretionary or ministerial, this court has not laid down a hard and fast rule for determining each case, but the test most often cited is set forth in Poyner v. Gilmore, 171 Miss. 859, 158 So. 922 (1935). This case involved an action against a chancery clerk for failing to attach his certificate to a probated claim resulting in its disallowance. The court held that this was a ministerial function because under the statute it was the clerk's mandatory duty to admit a claim to probate if the affidavit conformed to the statute. The court stated:
... "The most important criterion, perhaps, is that (if) the duty is one which has been positively imposed by law and its performance required at a time and in a manner or upon conditions which are specifically designated, the duty to perform under the conditions specified not being dependent upon the officer's judgment or discretion," the act in discharge thereof is ministerial. "That a necessity may exist for the ascertainment, for personal knowledge or by information derived from other sources, of those facts or conditions, upon the existence or fulfillment of which, the performance of the act becomes a clear and specific duty, does not operate to convert the act into one judicial in its nature. Such, it is said, is not the judgment or discretion which is an essential element of judicial action. Thus a sheriff must determine whether process coming into his hands for service, is issued from a court of competent jurisdiction and is regular on its face, and a treasurer of public money must ascertain whether a warrant for its payment is drawn by such an officer and is in such a form that its payment becomes a duty; but the execution of the process and the payment of the warrant are ministerial acts." . ..
171 Miss. at 864-65; 158 So. at 923. (Citations omitted.)
*695 Davis v. Little, 362 So.2d 642 (Miss. 1978), involved a tort case against a supervisor charging the supervisor with negligence while driving a county owned pickup truck. This Court held that the supervisor was not immune as to the act of driving the vehicle because it did not involve an official discretionary decision making process and was not an act of the board as a whole. The court stated:
The immunity of public officials, on the other hand, is a more limited principle, since its purpose is not directly to protect the sovereign, but rather to do so only collaterally, by protecting the public official in performance of his governmental function. Given the more limited function, courts have generally extended less than absolute immunity. The most commonly recognized limitation is the distinction between discretionary acts as opposed to ministerial acts. Under this distinction the official is immune only where that which he does in the performance of his lawful duties requires "personal deliberation, decision and judgment." See Prosser, Law of Torts, § 132 (4th ed. 1971).
362 So.2d at 643.
There is a classic statement of the policy granting public employees and officials immunity to suit in Judge Learned Hand's opinion in Gregoire v. Biddle, 177 F.2d 579 (2d Cir.1949). Judge Hand stated that officials should not have to answer civil lawsuits. Judge Hand discussed the facts in the case and held that it was proper to dismiss the case without the necessity of the public official involved in that case being subjected to a trial. He stated:
... The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation. Judged as res nova, we should not hesitate to follow the path laid down in the books.
177 F.2d at 581.
This statement is in line with the policy statement of Judge Bowling in Pruett, supra, that the abolition of the public official's qualified immunity to suit may result in an excess of caution on the part of our public officials with consequent detriment to the public interest.
In the instant case the defendants have been vested with broad discretion in formulating policies and in carrying out detailed treatment in order to prevent the spread of tuberculosis or other communicable diseases when faced with such a threat. Certainly these discretionary responsibilities vested in these defendants are for the benefit of the public. In her rebuttal brief Emma Hudson argues with some force that once the defendants in this case made the decision to treat Earl Hudson, the treatment administered by them was a ministerial act rather than a discretionary act. She relies on authorities from other jurisdictions espousing this view.
We decline to follow the cases cited in the rebuttal brief because we believe that the discretion given to the defendants applied, not only to their decisions with reference to instituting a program of control, but also to the treatment administered in carrying out such policies. This was the *696 part of an overall scheme designed for the public good to prevent the possibility of the spread of tuberculosis in the community. Besides, the administration of medical treatment involves the exercise of considerable professional judgment and hence discretion, as is manifest from a review of the facts of this case.
The public officials of this state, elected or appointed, enjoy a qualified immunity to a civil action for damages when acting in the performance of official functions discretionary in nature. They lose that immunity only when they substantially exceed their authority and commit wrongs under color of office. They have no immunity where they commit willful wrongs or malicious acts. Stokes v. Newell, 174 Miss. 629, 642, 165 So. 542, 545 (1936). See also, Jackson v. Hollowell, 714 F.2d 1372 (5th Cir.1983); Bogard v. Cook, 586 F.2d 399 (5th Cir.1978). This is the condition of the qualified immunity enjoyed by these defendants.
In determining whether the trial judge properly granted summary judgment for these defendants, we inquire whether the plaintiff has produced anything which would suggest malice, willful wrongs or acts by these defendants substantially outside their official authority.
We find only that plaintiff has stated a claim for negligence - medical malpractice, if you will. This is insufficient as a matter of law to pierce the veil of the qualified public official immunity enjoyed by these defendants while they are performing their discretionary functions. There being no genuine issue of material fact, these defendants were entitled to judgment as a matter of law. Smith v. First Federal Savings & Loan Association of Grenada, 460 So.2d 786 (1984); Brown v. Credit Center, Inc., 444 So.2d 358 (Miss. 1983). The trial judge correctly so ruled.
AFFIRMED.
WALKER and ROY NOBLE LEE, P.JJ., and BOWLING, HAWKINS, DAN M. LEE, PRATHER, ROBERTSON and SULLIVAN, JJ., concur.
PATTERSON, C.J., not participating.
NOTES
[1] Sitting pursuant to Mississippi Code Annotated, Section 9-3-6 (Supp. 1982). The above opinion is adopted as the opinion of the Court.
[2] Rule 12(b) provides in part the following: "... If, on a motion to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56; ..."
[3] In response to Pruett, supra, the legislature adopted Act of May 15, 1984, Chapter 495, 1984 Mississippi Laws, dealing with the question of sovereign immunity.